Filed 4/19/23  P. v. Kitzman CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KYE WEST KITZMAN,<br><br>    Defendant and Appellant. | H048726<br>(Santa Clara County<br>Super. Ct. No. F1766966) |

## I.  INTRODUCTION

Defendant Kye West Kitzman was convicted by jury of spousal rape (former Pen. Code, § 262, subd. (a)(1))[1] of S. Doe; two counts of oral copulation with a child aged 10 or younger (§ 288.7, subd. (b)) and two counts of aggravated sexual assault of a child under the age of 14 by rape (§§ 269, subd. (a)(1), 261, subd. (a)(2)) regarding daughter K. Doe; and simple assault (§ 240) of D. Doe, defendant's daughter from a prior relationship.  The jury also found true the allegation that defendant was guilty of two or more sex offenses against more than one victim (§ 667.61, subds. (b) & (e)).  The trial court sentenced defendant to an aggregate term of 60 years to life.  Defendant was granted 1,093 actual days credit plus 164 days of conduct credit and ordered to pay various amounts, including a criminal justice administration fee of $129.75.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends that: (1) the trial court erred by admitting evidence of uncharged sex offenses committed against an ex-wife; (2) the court erred by excluding a photograph that showed his daughter and topless wife; (3) the court erred in admitting child sexual abuse accommodation syndrome (CSAAS) evidence; (4) the prosecutor committed misconduct and the court erred by allowing the prosecutor to recite in cross-examination the facts underlying defendant's out-of-state conviction for sexual assault; (5) cumulative error requires reversal; (6) he is entitled to additional presentence custody credit; and (7) any unpaid balance regarding the criminal justice administration fee must be vacated. The Attorney General concedes the last issue.

For reasons that we will explain, we will (1) modify the judgment by awarding 1,097 actual days credit and 164 days of conduct credit, for a total of 1,261 days of presentence custody credits; and (2) order the portion of the criminal justice administration fee that remained unpaid as of July 1, 2021 be vacated (see Gov. Code, § 6111, subd. (a)). We will affirm the judgment as modified.

## II. BACKGROUND

### A. *Pretrial Motions*

The charges against defendant arose out of the abuse of his wife S., their daughter K., and his daughter D. from a previous relationship. Prior to trial, the parties filed several motions in limine.

Relevant to this appeal, the prosecutor filed a motion in limine to admit evidence under Evidence Code section 1108 of defendant's prior sexual assaults of three women: (1) a woman repeatedly raped between approximately 1992 to 1995, (2) an ex-wife, A., who was sexually assaulted, including raped, repeatedly from 1995 until 1998, and (3) a 1998 Wisconsin conviction for third degree sexual assault for raping another woman. The prosecutor filed a separate motion in limine to admit certified records of defendant's 1998 Wisconsin conviction, as the victim was apparently unwilling to testify at trial. Defendant filed a motion in limine to exclude the evidence regarding the assaults of all

2

three women under Evidence Code section 352. The trial court ruled that evidence of the sexual assaults of all three women was admissible, but it limited the scope or form of the evidence. Regarding the Wisconsin assault conviction, the court indicated that the abstract of judgment would be admitted but that the underlying facts would be excluded as inflammatory and prejudicial.

The prosecutor filed an additional motion in limine to exclude a mother-daughter photograph of S. and K., in which S. was topless, as unduly prejudicial. Defendant contended that the photograph was relevant to show (1) K.'s sexual knowledge may have come from S. and (2) S.'s bias against defendant based on her initial claim to police that defendant took the photograph whereas it appeared to be a "selfie" by S. The trial court ruled that the photograph would be excluded as "too distractive and time-consuming."

Defendant filed a motion in limine seeking to exclude and/or limit CSAAS evidence. After hearing argument from the parties, the trial court ruled that CSAAS evidence would be admitted.

### B. *The Prosecution's Case*

#### 1. Defendant's Abuse of Wife S.

At the time of trial, S. was 38 years old. She met defendant in August 2000, when she was 18 years old. They were introduced by S.'s cousin one week after defendant's release from prison. S. was aware that defendant had a 1998 conviction in Wisconsin for sexual assault[2] and that he was required to register with the police because of his conviction. Defendant and S. married in December 2000.

At some point, defendant began participating in jujitsu, a type of martial arts involving "fighting techniques." Defendant was a little over six feet tall and about 250 pounds. He was bigger than S. and very strong. S. had a background in martial arts and participated in martial arts training for a period of time.

---

[2] A copy of the minutes from the Wisconsin criminal case reflecting defendant's conviction was admitted into evidence.

S. testified that defendant was physically and sexually abusive throughout the marriage. Defendant had slapped her before they married, but he was very apologetic and told her that he would not do it again. Within a year, however, defendant began to get angry and violent with S.

The physical abuse included slapping or shoving. Defendant sometimes hit S. in the face, but he mostly hit her in areas where the red marks or bruises could be covered with clothing. Defendant would also "put [S.] to sleep" by wrapping his arm around her throat from behind which caused her to "be out in a matter of seconds." S. was too scared to report or leave defendant because he had threatened to kill her.

Defendant often engaged in nonconsensual sex with S. S. had chronic pain issues in her stomach and pelvic area and at times told defendant she did not want to have sex, but defendant would still insist. He also forced her to have sex "in different ways," including vaginal, anal, and oral sex, and he engaged in "rough sex," such as choking and slapping, without her consent.

S. reported to the police that she told defendant "no" all the time regarding sex and that to the extent she complied with having sex, it was out of fear. At trial, however, S. testified that there was "consensual sex mixed in between" the incidents of nonconsensual sex. When asked at trial about this "type of a relationship" with consensual and nonconsensual sex, S. explained that defendant was "very sweet at times, so it was easier to hope things would get better." He was also manipulative and provided financially for the family. S. further testified that she was too scared to leave him although she had considered it many times.

S. testified that the last incident of sexual abuse occurred in June 2017. Defendant had sex with her even though she had told him no. S. did not initially resist because she knew he would get more violent. During the incident, defendant choked her, at which point she "struggled" and tried to stop him.

4

Throughout their relationship, S. and defendant took "provocative pictures" of each other, including nude and explicit pictures. At trial, S. testified that she did not want to take "[a] lot" of the pictures but that defendant knew how to make it look like she did. The photos were stored on the family computer or on their cell phones. None of the pictures showed any abuse of S.

Defendant and S. also engaged in "sexting." S. testified that "[a] lot of the time[]" it was against her will. She testified that she felt compelled to respond out of fear that defendant would get upset if she did not. S. later told the police that defendant sent her abusive text messages that included calling her "awful names." S. told the police, however, that she did not have any of those messages saved on her phone.

During the marriage, defendant had sex with other women. S. testified that she did not like it, but she did not have a choice. She also testified that she was "almost relieved" when defendant had sex with other women because then she "wouldn't have to be in pain." The arrangement was that he slept with other women, but he came home to S.

Beginning in 2015, defendant was in a relationship and lived with S.'s friend, L.C., for approximately one and a half to two years. S. was upset and felt betrayed by both defendant and C. At the time, S. hoped defendant would come back, because she "didn't want to have a failed marriage." Defendant filed for divorce from S., but he did not follow through and ultimately moved back in with S. S. knew that defendant continued to see C., however. At trial, S. denied making up allegations against defendant because she felt anger or betrayal over his relationship with C.

Early in the marriage, defendant and S. had a daughter, K. Defendant would have S. roleplay during sex by pretending to be a little girl, including pretending to be K. S. went along with it because she believed defendant would become more violent if she did not comply. S. worried that the role-playing "could possibly cross over" into reality. She often asked defendant, but he denied that he would ever touch K.

5

In approximately July 2017, however, an incident occurred that caused S. to be suspicious. S. walked out of her bedroom and saw defendant "hovering over [K.]" S. testified that defendant was wearing shorts and K. was wearing a nightgown and lying on her back on the couch. S. "freaked out" and asked defendant "what the hell was going on." Defendant moved back, sat in a chair, and told her that she "needed to shut up." S. suspected that defendant had "touch[ed]" K. but was not sure.

S. and K. moved out of the residence in August 2017, and immediately moved in with F., to whom S. later became engaged. At trial, S. denied being in a relationship with F. before moving in with him. F.'s daughter, P., however, testified that her father and S. were "together" before S. and K. moved in with them.

S. filed for divorce from defendant in late August 2017, and sought a restraining order to prevent him from seeing her or K. S. and F. also had a child together in June 2018. By the time of trial in 2020, S. and defendant were divorced.

S.'s friend lived at the same RV park as S. for about a year and a half. S. told her friend about defendant's abuse. The friend testified that when S. disclosed the abuse, she sounded nervous and scared. S. cried when she showed the friend the photographs that were taken by defendant. S. also indicated that she was suspicious about defendant sexually abusing K. The friend encouraged S. to report everything and helped S. when she eventually moved out.

### 2. Defendant's Abuse of His Younger Daughter K.

At the time of trial in February 2020, K. was 16 years old. Defendant, S., and their daughter K. lived in a two-bedroom trailer in an RV park throughout K.'s entire life. S. was a stay-at-home mother, while defendant's job entailed servicing and changing large commercial vehicle tires. Defendant often left for work early in the morning before K. got up. Afterwards, he would go work out and train for jujitsu, and he sometimes did not get home until 10:00 or 11:00 p.m. after K. had gone to sleep.

6

For a period of time, K. took classes at defendant's training facility. Defendant's jujitsu friends were friendly and treated her like she was part of the training family. K. and her mother S. sometimes attended defendant's jujitsu tournaments on the weekends.

K. testified that defendant "insist[ed]" that she do "extreme" workouts, including pushups, sit ups, squats, and jumping jacks "[t]o the point where [she] couldn't stand." K. complied because she was "scared" that defendant would "harm[]" her.

K. "felt like" she had to obey defendant. He either grounded her or spanked her buttocks with a belt when she disobeyed him. Defendant also told her when she was very young to never call the police.

When K. was about eight or nine years old, she saw defendant physically abuse her mother, S. Specifically, defendant slapped S. at least twice. This made K. more scared to disobey defendant.

K. testified that defendant began touching her inappropriately when she was seven or eight years old. He took off her shirt, touched her breasts, and used his hand to rub her vagina over her clothing.

When she was eight years old, defendant made her hold his penis, move her hand on it, and orally copulate him. The incident ended after defendant ejaculated in her mouth. K. did not tell her mother, S., about the incident because K. thought S. would be upset. When asked how many times defendant had her orally copulate him, K. testified, "Too many to count." A couple of months after K. started orally copulating defendant, defendant also orally copulated K.

In 2015, when K. was about 11 years old, defendant began inserting his penis in her vagina. K. testified that the first time, they were lying down, his penis went in a "little bit," and it was very painful. After being shown her preliminary hearing testimony at trial, K. acknowledged that she had previously testified that she and defendant were standing during the incident. She subsequently testified at trial that the pair were standing.

7

In another incident, defendant made her get undressed, he pulled down his pants to his ankles, and then he got on top of her while she was on the couch. He then moved his penis in and out of her vagina. K. felt she had to comply because she was the child, she was "supposed to do what [she was] told," and she believed she would be grounded or spanked if she disobeyed. K. testified that the incident ended when her mother, S., who had been sleeping in the bedroom, started opening the bedroom door. K. testified that defendant "jumped off" of her, pulled on his pants, and sat in another seat. According to K., S. asked defendant what he was doing. K. also heard S. say to defendant in part, "If I ever catch you like that again." K. did not disclose to her mother what had been happening because she "didn't want [her mother] to worry." K. likewise did not tell anyone else because she thought she would get in trouble and "be harmed." When K. was initially interviewed by the police about this incident, she reported that defendant jumped off of her and that her mother "ended up knowing what happened and kicked him off the bed for the rest of the night."

K. and S. moved out of the RV where they were living with defendant and moved into an RV at the same park with a man named F. in August 2017. Prior to that time, K. and S. had gone on walks around the RV park, and F. had joined them. F. had a daughter named P., who was a few months younger than K.

Prior to that time, K. was an only child who did not have to "fight" for her mother's attention. They were best friends and had a "really special relationship." K. testified that her mother "was a constant in [her] life." Her mother was present every day for K. and had left her home alone "[o]nly a few times." K. was her mother's "sidekick." K. testified that when her mother started developing a relationship with F. and his daughter P., S. focused a little less on K.

When K. was around 13 years old, she disclosed some of defendant's abuse to P. and separately to another friend. At trial, K. testified that she told P. that defendant was doing something "harmful" to her, and she told her other friend that she was in a

8

"difficult situation" with defendant.  She testified that she did not tell P. or her other friend that the harmful or difficult issue involving defendant was sexual in nature.

However, P. testified that K. told her that defendant was doing sexual things to K. K. appeared sad and upset when making the disclosure.  K.'s other friend testified that K. had stated that defendant "tried to put his private parts into her private parts" when she was younger.  The friend stated that during the disclosure, K. appeared nervous and timid.

K. kept a journal while she was in middle school.  In the journal, she described being bullied at school, that sometimes she did not know why she cried, that she was barely sleeping, and that she needed to talk to someone about the things she was going through because it "hurt[] [her] mentally."

K. did not write about defendant's abuse in the journal.  She testified that if she wrote it down, she would be "reliving it too much."  K. also testified that defendant's sexual abuse did not influence what she wrote in the journal, but that the abuse made it harder for her to talk to people.

The first entry in the journal was made on August 30, 2017, which was around the time that K. and her mother S. moved in with F.  K. wrote that her mother was giving F.'s daughter, P., a lot of attention.  K. felt jealous and was hurt.  K. was also fighting with her mother.

Approximately three months after K. and S. moved out from living with defendant., and after K. observed a November 2017 school presentation called "Be Seen and Heard" about sexual abuse victims who are unable to speak up, K. disclosed defendant's abuse.  At trial she explained that the school presentation "impacted" her because the presenter "didn't speak up for 11 years," and K. "didn't want to be silent for that long." She further testified that the presentation gave her the courage to speak up. After the presentation, K. filled out a form indicating that she was the victim of abuse and turned it into a teacher.  The police were called, and K. provided a statement to the

9

police. A police detective, Sheena Woodland, subsequently conducted a lengthy interview of K. At trial, K. denied that she came forward about the abuse because she wanted to get attention, or because she wanted her mother to pay more attention to her than to P.

K.'s mother S. testified that when K. disclosed defendant's sexual abuse to the police, S. also reported defendant's abuse of S. S. explained that her daughter K. "was so strong" and finally told someone, so S. "felt [she] could do the same" even though she was still terrified of defendant. K. believed S. was a "pretty tough woman."

### 3. Defendant's Assault of His Older Daughter D.

D. was defendant's daughter from a prior relationship. D. was raised by her mother in another state. D.'s minimal contact with defendant consisted of phone or video calls. D. was almost 25 years old at the time of trial in 2020. She had a 2016 misdemeanor conviction for fraud.

D. testified that defendant visited her once when she was 10 years old. He took her for ice cream and then brought her to his motel room. Defendant showed her jujitsu or wrestling moves, "flipped [her] around," and placed her in "headlocks and body-locks." He told her that "one day [she] would be doing this with other boys."

In 2012 or 2013, when D. was 18 years old, she was having problems with her mother so she moved in with defendant, S., and K. in California. D. testified that while living with defendant, she was not allowed to go on dates and that defendant threatened the life of one of her dates who took her to a movie. D. testified that she was also not allowed to have friends or participate in extracurricular activities. She was "confined to the house" and got "beat with a belt" if she was caught talking to anyone who defendant did not approve of.

D. also testified that defendant made her and K. do "ridiculous" exercise routines, including jumping jacks, pushups, sit ups, and running in place for "hours at a time."

10

According to D., if defendant found out that they did not do the workouts, he would "beat" them with a belt.

In addition to having their bare "butts" "smack[ed]" "really badly" by defendant, D. testified that she was also "choked out on the kitchen floor for talking back."

D. testified that defendant physically and mentally abused S., including throwing her to the ground and saying "horrific things" to her. In one incident, D. woke up in the middle of the night to "what sounded like choking and slapping." She heard S. "trying to gasp for breath and whimpering." D. testified that she heard defendant say to S. that "he didn't care" and that "he was going to fuck her in the ass anyways." D. heard S. crying. D. previously testified that S. was always covered in bruises.

D. testified that defendant had acted inappropriately with her. When she first saw him after landing at the airport, he "French kiss[ed]" her with his tongue in her mouth.

In another incident, D. slipped and fractured her wrist while she was at a community shower with S. and K. D. testified that defendant carried her naked through the trailer park and back to their residence. He told her that her breasts were really big and nice. S. took D. to the hospital. After they returned home, the entire family lay on the bed in the master bedroom where it was dark. S. was turned towards K., who was lying on her side and facing the wall, and the pair were sharing headphones while watching something on S.'s phone. D. testified that she was on her stomach with defendant sitting on her thighs after having offered her a back massage. D. was wearing only a T-shirt that went down to her thighs, and defendant was wearing only boxers. D. testified that defendant removed her shirt and rubbed her back and buttocks. D. testified that she then felt defendant's penis "up against [her] vagina." She tried to wriggle away. Defendant "kind of laughed it off" and continued rubbing her back when D. "felt it a second time." She told him to stop at some point. D. testified that she got up, grabbed her shirt, went back to her bedroom, and cried herself to sleep. D. believed that if she reported the incident to the police, defendant "would beat [her] until [she] died."

11

D. lived with defendant for about five or six weeks. The day before she left, she was at a street fair with S. and K. D. testified that S. had misplaced $20 and called defendant on speakerphone to ask if he had taken it. Defendant accused D. of stealing the money and told S. that he was on his way home to "beat [D.'s] ass." After they all arrived home, defendant accused D. of being a thief, which she denied, and he beat her with a belt. D. testified that she fought back by grabbing the belt and trying to hit him with it, but he punched her in the face. D. testified that she was knocked to the ground and "out cold for a few seconds."

D. went to the RV park's main office and called the police because she was scared that things would escalate and defendant would eventually kill her. Her face was swollen and red. She told the police that she wanted to press charges but she also wanted to return to her home out of state. According to D., defendant was arrested, and both of them were taken to the police station. However, D. testified that the police told her that they had given defendant an "ultimatum to fly [her]" back home out of state and that he borrowed money to buy her a plane ticket. D. testified that defendant was let go, and early the next morning she took a flight out of state. She felt angry, disappointed, and violated.

S. testified that she saw defendant slap D. during the incident. S. did not remember whether he punched D. or whether D. was knocked out on the ground. When S. reported defendant's abuse of her to the police years later, S. also told the police about this incident in which defendant hit D. D. never told S. that defendant had sexually assaulted D.

D. did not see defendant again until trial. D. initially testified that she learned about defendant's criminal case from Sheena Woodland, an investigator from the district attorney's office who had called her. D. later testified at trial that she had actually heard about law enforcement's involvement with defendant from her biological mother and

12

from S.  At trial, D. stated that she was testifying to support S. and K., and because D. "need[ed] closure and . . . to be able to sleep better at night."

### 4. CSAAS Expert Testimony

Dr. Blake Carmichael testified as an expert in clinical psychology.  He explained that CSAAS addresses "myths and misconceptions" about children who have been sexually abused and that CSAAS helps people understand why children "do or don't do certain things."  The five elements of CSAAS are secrecy; helplessness; entrapment and accommodation; delayed, unconvincing, or conflicted disclosure; and retraction.  Dr. Carmichael explained the first four elements at trial.  Dr. Carmichael testified that he did not know anything about the facts of the case, and he had no opinion about whether sexual abuse had occurred.  He explained that CSAAS is not a diagnosis and cannot be used to determine whether someone has been sexually abused.

### C. *The Defense Case*

### 1. Defendant's Parents

After defendant and S. married, the pair lived in a trailer for about two years on defendant's family's farm.  Defendant and S. had breakfast and dinner at his parent's house.  Defendant's mother testified that defendant and S. had a good marriage, that S. was a physically strong woman who seemed to be able to speak her mind, and that she never appeared afraid of defendant.  Defendant's father likewise testified that defendant and S. appeared to get along well, S. did not appear afraid of defendant, and defendant never yelled at her in anger.

When defendant and S. visited the family farm on later occasions, their marriage still seemed loving and good.  Daughter K. also did not have any bruises and did not seem scared of defendant.

Defendant's mother testified that she never saw any bruises or injuries on S.  Defendant's father testified that he saw a bruise "just above [S.'s] pelvic" area when he

13

walked in on her on one occasion. S. indicated to defendant's father that the bruise was not from defendant.

Defendant's older daughter, D., also lived at his parent's house for a period of time. Defendant's mother described D. as a "mean little witch." D. did not obey the house rules, did not go to school, and would stay up all night and sleep all day. Defendant's mother testified that in one incident, D. "smacked" her after she would not let D. walk to town. Defendant's father testified that D. told him, "If you don't let me have more freedoms out here, . . . I'm going to tell them that you've been having sex with me." Defendant's father "resented" D.'s statement as he had tried to do everything he could to help her. Defendant's father further testified that he caught D. stealing his pills and that she admitted stealing his gun.

## 2. Investigation by a County Social Worker

A county social worker visited S. and K. at the family residence on March 15, 2012, to investigate an allegation of general neglect regarding a "dirty home" and the educational needs of eight-year-old K., who was being home schooled at the time. During the visit, the social worker found the RV "unkempt." S. was cooperative during the visit, but the social worker became concerned when K., who was lying on the floor, "started making barking sounds at [the social worker]," which was not "age-appropriate behavior." K. otherwise refused to speak to the social worker, which prevented the social worker from doing a full assessment of her.

During a follow up visit, defendant, S., and K. were present. Defendant appeared "strongly motivated to keep the department out of his family business." S. seemed "completely dependent" on defendant, and defendant did not believe there was an issue with the condition of the RV. The RV was cleaner, however, than during the first visit. Defendant told the social worker that K. was afraid that the social worker had come to take her away. The social worker testified that defendant's statement "really took away any opportunity for [the social worker] to interview [K.]" K. glared at the social worker

14

and was more reserved during this visit. The social worker testified that K. did not appear afraid of either parent. The social worker believed that K. would benefit from mental health services in view of the prior barking incident and repeatedly offered family services. The social worker observed that S., other than denying the barking incident, remained silent during this visit. The social worker believed S.'s lack of participation during the second interview was "a sign of concern in terms of the dynamics of power and control." At the same time, however, the social worker did not observe any bruises or injuries on S. or K. that were of concern.

### 3. Police Investigation of the Assault of Older Daughter D.

One of the police officers who was dispatched to the RV park on September 28, 2013, after defendant hit D., testified at trial. D. reported that she had been hit and choked by defendant after a dispute over $20, but she did not report being sexually assaulted. She also reported that a week prior defendant had been hitting her with a belt and that her stepsister was also being abused. The police officer testified that if an 18-year-old had been punched and knocked unconscious, the perpetrator would be arrested if the victim wanted to press charges. According to the computer-aided dispatch (CAD) log, which shows calls to the police for service and communications between officers and the dispatcher, D. did not want to press charges and defendant was not arrested after the incident. The CAD log indicated that defendant bought D. a plane ticket and that she did not want prosecution, but this arrangement was not directed by any of the responding officers. The officer testified that he would never tell a defendant that he would not be arrested if he bought the victim a plane ticket to fly away.

### 4. Witnesses' Observations of the Family

The family's next door neighbor, Rena Empleo, who had known the family for several years, testified that S. and defendant were "not a lovey-dovey couple" and appeared to live "separately" in the same house. According to the neighbor, S. was the "dominant one" in the relationship, she "boss[ed]" defendant around, and during

15

arguments she yelled while he listened.  The neighbor never heard anything that sounded like someone was being struck, and she never noticed bruises or injuries on S.  The neighbor testified that K. did not appear scared of defendant, was attached to him, and was "[a]lways holding on to him."  The neighbor testified that just prior to K. moving out, K. and her friends were removing belongings from a storage shed, which was located by the family's RV.  The neighbor heard K., who was angry and crying, saying "she should never have put her dad in jail."  The neighbor testified that S. was "hanging out" with F., to whom S. later became engaged, about two months before S. and K. moved in with him.

When asked for her opinion on direct examination, the neighbor testified that defendant was not a violent person, he was a "very quiet, peaceful man," and he was never "sexually inappropriate."  On cross-examination, when asked whether she knew that in 1997 defendant had raped a woman, the neighbor responded that she had "heard of that."  The prosecutor proceeded to ask the neighbor on cross-examination,  "So . . . you had described the defendant as a nonviolent, peaceful, nice person.  So what I want to ask you is did you know that in 1997 he had nonconsensual, forcible sex with a woman?  He told her he wanted to whip her for ten minutes.  She said no.  He held her head down and said to enjoy it.  He continued to strike her.  She asked to stop and tried to protect herself.  He continued.  She cried and asked him to please stop.  He continued and had sex with her nonetheless.  And then he told her, after he looked at her back, told her to keep it covered and not to show anyone.  Were you aware of that?"  The neighbor responded, "No, not really," and indicated that it did not change her opinion about defendant.  She explained that it was "the past," and "[a]s long as it doesn't affect [her]" she was "okay" with it.  When asked whether the prosecutor's description was "pretty sexually inappropriate," the neighbor responded, "If it was to me, yes.  If it was to somebody else, that's them."  On redirect examination, the neighbor indicated that she had no "way of knowing" whether the prosecutor's description was "true or false."  On

16

recross-examination, the neighbor admitted that she knew defendant was convicted of sexual assault in 1998.

The office manager for the RV park never noticed bruising on S. or K., and they did not seem scared of defendant. The office manager had also never seen K. doing "extreme workouts." Further, no female tenants had expressed concerns to the office manager about defendant being "inappropriate."

The property manager for the RV park likewise never noticed any unusual bruises on S. or K. The property manager characterized S. as a "confident woman" even when she was around defendant, and she did not appear afraid of him. The pair seemed to be a "happy couple." K. also seemed confident for her age and did not appear afraid of defendant. The property manager never saw K. doing "extreme workouts."

Howard Turner had known defendant for 11 years. The pair trained for jujitsu and also socialized together outside the gym. For a period of time, K. also trained at the gym. Defendant and K. had a "loving . . . father-daughter relationship." Turner testified that K. could do more push-ups than him and never complained about having to do them. Turner had never seen defendant make her do "extreme workouts." Turner further testified that he never suspected S. or K. had been abused, he never saw them with unusual bruises or injuries, and they never seemed afraid of defendant. S. appeared to be a confident person and was not timid around defendant. S. and defendant "loved each other" and seemed to be "on the same team."

On direct examination, Turner testified that in his opinion, defendant was not a violent person with respect to S. and K. and that defendant was not someone who was capable of sexual assault. Turner was not aware that defendant had been imprisoned years ago for sexual assault. "If evidence was supplied" that defendant used physical force to have sex with someone who did not consent, Turner testified that it would change his opinion about defendant.

17

On cross-examination, Turner confirmed that in his opinion, defendant was a nonviolent person outside the realm of sporting events and jujitsu, and that defendant was not capable of sexual assault. The prosecutor then asked Turner whether he knew that: "In 1997 in Wisconsin [defendant] had sex with a woman against her will. He struck her. He said he wanted to whip her for ten minutes. She said no. He held her head down and said to enjoy it. He continued to strike her with a belt. Again she asked him to stop and tried to put her hands over her back, but he kept moving them. She cried and asked him to please stop, but he persisted. And after the sexual assault, he checked her back and told her to keep it covered and not to show anyone." Turner responded that he was not aware of it. He agreed that it was "violent" if "that account [was] accurate." Turner also did not know that in 1998, defendant was convicted of sexual assault in Wisconsin. He was further asked whether he knew that defendant had beat and sexually assaulted his first wife, L., in Wisconsin, and that he had beat, raped, and sexually assaulted his second wife, A. Turner indicated that he did not know, but he agreed that "those things [were] violent." Turner indicated that the information revealed by the prosecutor would change Turner's opinion about whether defendant was capable of sexual assault.

On redirect examination, Turner stated that he did not know whether any of "the horrible things that the [prosecutor] just read" were true.

Nick Schilbe had known defendant for about 10 years. Schilbe trained with defendant in jujitsu for a period of time, and they occasionally socialized outside the gym. Schilbe testified that defendant and S. were "equal[s]" in their relationship, were "the perfect match for each other," and were "very confident, loud, gregarious people in their own right." Schilbe testified that S. was "very confident in her ability and previous history in martial arts." When defendant was training with K., Schilbe never saw K. doing an "extreme workout." K. bragged about her ability to do pushups and run a lot. Defendant was supportive of K.'s endeavors, and the pair appeared to love each other

18

very much. Neither S. nor K. seemed scared of defendant. S. and K. were defendant's biggest fans. Schilbe never saw bruises on K., and the injury or bruising he once saw on S. was a "long time ago" and "related to her illness of some kind."

### 5. Police Investigation After K.'s Report of Abuse

Sheena Woodland was formerly a police detective and the investigating officer in defendant's case. By the time of trial, she was an investigator for the district attorney's office. Several search warrants were obtained in connection with the case. Woodland reviewed hundreds or thousands of photographs (including S. nude or seminude), videos (including of a sexual nature), and messages that were located on defendant's cell phone, S.'s cell phone, and/or the family computer, disks, or drives but did not find any signs of physical or sexual abuse of S. or K. or threats by defendant. A lot of the photographs and videos of a sexual nature showed defendant's interest in young girls although Woodland could not determine the exact age of the individuals. There were also recorded phone calls between defendant and other people in which defendant expressed an interest in underage girls, such as "talking about teenage school girls needing to take off their panties and go into the corner."

Woodland interviewed K. on November 30, 2017. K. took long pauses and put her head down a lot of times, and she also "kind of turn[ed] red as if she was upset" during other times in the interview.

Woodland interviewed S. on March 14, 2018. S. reported that if she failed to send nude pictures to defendant as he requested, she would often be abused. S. also reported receiving text messages in which defendant called her derogatory names, but Woodland did not find any such messages.

When Woodland contacted D. in December 2018, D. indicated that she knew about defendant's criminal case because she had spoken to K. and S. D. told Woodland that defendant had been arrested after the incident in which he punched D. in the face, and that she flew home the next day after defendant bought her a plane ticket. Woodland

could not find a report showing that defendant was arrested for the incident. D. also reported to Woodland that defendant had raped her while S. and K. were in the same bed, but neither S. nor K. mentioned this incident to the police.

### 6. Defendant's Affair with C.

C. testified that when she met S., who became her friend, defendant and S. appeared to have a good relationship. It seemed more like a friendship, however, because they had an "open relationship and slept with other people." C. testified that S. told her that defendant worked and did all the household chores. C. never saw any bruises or injuries on S. or daughter K., and C. never saw defendant yell or hit K. K. was happy around defendant and did not seem afraid of him.

C. testified that S. stated that defendant could sleep with other women outside of the marriage. S. seemed "happy" with the arrangement. C. testified that S. had "hit on [her]," and because S. liked women, S. preferred that defendant slept with other women. C. believed S. had given defendant permission to pursue C. because S. told him that he could message C.

C. and defendant began a romantic relationship. A few months later, defendant started living with C. Defendant was never violent with C., and C. expected it to be a monogamous relationship. C. knew S. was upset about defendant living with C. Defendant eventually filed for divorce from S. The relationship between C. and defendant lasted about two years. When defendant went back to S., C. was "heartbroken."

C. did not know that defendant had made inappropriate comments to his brother about her teenage daughter. Such comments would change her opinion about defendant. C. also did not know about defendant's disparaging comments that objectified women. When asked whether she knew defendant as well as she thought, C. indicated that she did not "know that person" who was making the comments.

20

### 7. Defendant's Testimony

Defendant testified in his own behalf. He went to prison in Wisconsin for "sexual intercourse without consent" in 1998. Defendant received four years as part of a plea deal. He was released from prison in August 2000, and was on parole for 16 months. Defendant also had to register as a sex offender for life.

Defendant testified that he was 27 years old and had been out of prison for two or three weeks when he met S., who was almost 19 years old. S. was in karate, and defendant found her to be very outgoing and confident. According to defendant, when he told S. about his prior sexual assault and prison time, she said, "That kind of excites me." The pair engaged in sexual activity the same night that they met, and they started living together after the first or second night. Within the first week, they became engaged. Defendant testified that about three or four years into the marriage, S. told him that "if [he] ever left her, she'd put [him] back in prison." According to defendant, this became a "common threat" that S. made three to five times a year.

For the first two or three months of their marriage, defendant asked for S.'s consent each time before having sex. S. eventually told him that he did not need to ask every time. S. began having medical issues, including abdominal pain, during the first four years of marriage, which increased later in the marriage. Defendant testified that S. never told him "no" until "later on when she started hurting." Other than when S. was in physical pain, she never told him that she did not to have sex. Defendant testified that when S. was in pain, they did not have sex. He testified that throughout the entire marriage, S. was a consenting partner and that she consented to every sex act that he had with her.

During the marriage, defendant and S. had "[n]ormal argument[s]." Defendant testified that when he got angry, he was quiet, did not get violent, and would leave to avoid a confrontation. He denied hitting, beating, or choking S.

Defendant testified that they took nude and partially nude pictures together and that the initial idea was S.'s. They also documented their sex life throughout their marriage in pictures and videos. Defendant testified that he never threatened S. to participate in the pictures or videos, and she never indicated that she was unwilling. He also testified that he never forced her to send nude pictures of herself.

Early in their relationship the pair talked about sleeping with other people outside of the relationship. It was each person's choice whether to do so, and the expectation was that they would come home to each other. This occurred throughout the entire marriage, and S. appeared to be "okay" with it as long as he would "come home."

Defendant testified that after they met C., defendant told S. that he was sexually attracted to C. S., for the first time, told defendant "no," meaning she did not want him to have sex with C. who was her best friend. Defendant testified that he fell in love and began having sex with C. within two or three months. Defendant eventually moved in with C. Unbeknownst to C., defendant continued to have sex every week with S., who never told him no. After a few months, defendant filed for divorce from S. because he wanted to marry C.

S. eventually talked defendant out of the divorce by stating that "[K.] needs her daddy." Defendant moved back in with them for about three months in 2017. He was still in love with C., however. S. appeared to still want to have sex with defendant, as she would initiate it. Defendant believed the "passion" was gone from the marriage. K. was also "standoffish" and mad at defendant. S. eventually told defendant that she found someone else, and she and K. moved out.

At some point thereafter, defendant's brother stated in a phone call that he had a "pretty decent wife," and defendant responded, "You know what, mine too. [S.] was a great wife. I got no complaints. You know, she was fucking -- she was -- she was wonderful. I can't say nothing bad about her. She just left me."

22

Defendant previously described himself as a " 'professional asshole,' particularly towards women." He admitted that he had been unfaithful in every relationship, including cheating on wife S. with his girlfriend C., and cheating on C. with S. Defendant testified that S. was the only person that he was honest with about seeing other people. Defendant admitted that he had been with prostitutes when he was in his 20's through the time he was with his girlfriend C.

Defendant admitted looking at pornography on his phone and computer. He testified that some pornography websites have "categories of porn" and that he had visited the "teen" category. Defendant believed the females were not actually underage teens but just young-looking women.

Defendant acknowledged that he and his brothers had conversations that were demeaning towards women and "extremely sexually explicit," including regarding C. and her daughter. He also had conversation with his brothers about sex that he had outside of marriage. Defendant testified that some of things he said during these conversations about sex were not true. He also had a conversation about teenage girls "taking their panties off." Defendant acknowledged the conversations were filthy, disrespectful, cruel, and sexist, but considered it "locker-room talk." Defendant admitted that he liked "young women." Defendant, who was 47 at the time of trial, testified that he considered anyone 10 years or younger than him to be a young woman. He admitted having conversations with his brothers about having sex with young women and getting prostitutes. He denied that he had a "particular attraction towards teenage girls." Defendant testified that when he was negotiating for a prostitute in a recorded call, his expressed interest in a "young girl" meant a 19-, 20-, or 21-year-old girl.

In another phone call, defendant indicated that he was a "monster[]" but that he also had "a little bit of good" in himself. At trial, defendant testified that the statement "was meant in a joking manner" and that he and his brother had been laughing. He

23

explained at trial that "when you've been to prison and you have a sex crime conviction, you're looked at as a monster no matter what, even if you're not."

After his wife S. had moved out and then returned with a friend to confront him, defendant and his brother "jok[ed]" in one conversation that " 'women will talk tough' . . . 'when they know they won't be hit.' "  At trial, defendant explained that S.'s friend had pushed him several times, and he knew some women would push or hit a person "knowing they're not going to get hit back."

Defendant testified that he and his brothers received "spankings" as punishment by their father when they were growing up, and that a few times his father used a belt on him.  Defendant testified that it is not "right" to hit a woman.

K. was defendant's fourth child.  He was happy and excited because he "never got to be a dad to [his] other kids" and he was "hoping this one would be different."

Defendant started doing jujitsu 15 years ago.  He trained most days of the week and eventually began competing.  When K. was around seven or eight years old, defendant started K. in jujitsu and had her do 10-minute workouts that included 10 each of pushups, squats, sit-ups, and "burpees."  Defendant believed she was able to complete the workouts, and he did not punish her if she failed to do them.

Defendant admitted spanking K. three or four times over her clothes.  He testified that all the spankings were for K. lying about where she was.  Defendant denied using a belt on her or causing marks on her buttocks.

Defendant denied attempting to have sex with K. and denied orally copulating her or having her orally copulate him.  He also denied getting her naked on the couch.

Defendant had "[a]most zero" contact with his older daughter D. before she moved in with him.  She was having "legal problems" and "getting in trouble," so defendant thought it might be a "new start."  The pair had verbal disagreements "[a]lmost right away."  Defendant's rules included D. graduating from school, no

24

smoking in the house, no drinking, and letting him know where she was located. D.'s reaction was that she was 18 and an adult so she did not have to follow his rules.

Defendant "suggested" that D. workout with K. Defendant was not aware of D. doing the workouts, and there were no consequences for not doing them.

Regarding the incident in which D. slipped and fractured her wrist, defendant testified that S. and K. walked her home and that he did not carry her naked through the RV park. Defendant denied that they all shared a bed after D. returned home from the hospital.

The day before D. moved out, S. told defendant that she suspected D. had taken money from S.'s purse. When defendant later asked D. about the money, she denied stealing it. Defendant testified that D. "swung a punch" at him, and he slapped her with the tips of his fingers. Defendant denied that D. fell down after being hit. She left and called the police. Defendant denied being arrested. He testified that it was his idea to fly her home and that she left the next morning.

Defendant denied beating D. with a belt. He also denied taking off D.'s clothes when she was in bed and denied trying to put his penis in her vagina twice.

Defendant testified that S., K., and D. were lying when they testified. He denied being a "monster" to S. and K., and he denied wanting to have sex with D.

Defendant was married to A. for about four years in the 1990's. They had a child together. Defendant denied being violent with her or repeatedly sexually assaulting her.

Defendant stated in a phone call to his brother that defendant was "happy or grateful that A. and S. never called the cops." At trial, defendant testified that "a lot of times cops get called when there is no reason."

### D. *The Prosecution's Rebuttal Case*

A. was in a relationship with defendant in Michigan in the mid-1990's, when she was between the ages of 15 and 17. The relationship lasted until he went to prison in 1998. A.'s sister was married to one of defendant's brothers.

25

The first time that A. and defendant had sex, defendant's car had gotten stuck. He told her that she had to have sex with him if he got the car out. It was dark outside and they were alone. A. testified that she agreed to have sex with defendant only because she was scared.

When A. was 17 years old, she and defendant married, and they had a child together. Defendant physically abused her, including by punching her, slapping her across the face, and hitting her with coat hangers. He also put her in "sleeper holds," where he put his arm around her neck and put her to sleep.

Defendant also forced her to have sex. On one occasion, he forced her to have oral sex. On another occasion, they were in the backseat of a car that defendant's father was driving. Defendant put a Maglite flashlight inside of her and the forced her to have sex. On another occasion, they were in a car by her deceased sister's gravesite, and defendant forced A. to have sex. He told A. that "he wanted [her] deceased sister to see it too."

A. considered leaving defendant or going to the police but she was scared that he would hit her more. They separated when defendant went to prison.

A. texted defendant's brother in December 2017, inquiring about defendant's situation. A. texted defendant's brother, "I agree and pray he doesn't go to prison." A. had heard that defendant was being charged only for something he had done to his daughter K. A. also texted, "I sure hope he gets out of this shit. Why doesn't she just leave him alone if she moved on." A. was referring to S. At trial, A testified that she was concerned about defendant "not getting in trouble for [K.]" and that she (A.) did not think he would hurt his own daughter. A. further texted, "That's BS. I pray to God he gets out of this shit and the last laugh is on her." At trial, A. testified that she "was hoping the last laugh was on [S.] for the stuff they were saying that he supposedly had done to [K.]" A. further texted that she would not be able to write to defendant because the man who she was currently with " 'would not allow that.' " A. had previously written

26

to defendant when he was in prison the first time because, despite what he had done to her, she "still wanted [her] son to grow up knowing who his father was."

A. testified that these text messages were sent before she knew the prosecutor wanted her to testify against defendant. When the police contacted her and asked whether she had been sexually or physically abused by defendant, she replied that she would have reported it if it had occurred. A. also testified that she had never been questioned about the abuse until she was contacted in 2018 regarding defendant's current criminal case. A. did not voluntarily testify at defendant's trial and had to be ordered to appear. She testified that defendant's abuse caused her trauma and "nightmare after nightmare." At first, A. did not want to testify and "relive all the horrible nightmares." However, someone told her that "maybe it would be good for [her] to just get it out in the open so [she could] finally just move on with [her] life and just try to get the help that [she] needed to get over the nightmares and stuff."

**E.** *The Charges, Verdicts, and Sentencing*

Defendant was charged by third amended information with eight counts against his wife S., their daughter K., and his older daughter D. Regarding S., defendant was charged with spousal rape (former § 262, subd. (a)(1); count 4). Regarding younger daughter K., defendant was charged with two counts of oral copulation with a child aged 10 or younger (§ 288.7, subd. (b); counts 1 & 5) and two counts of aggravated sexual assault of a child under the age of 14 by rape (§§ 269, subd. (a)(1), 261, subd. (a)(2) or (6); counts 2 & 3). Regarding his older daughter D., defendant was charged with forcible rape (§ 261, subd. (a)(2); count 6), forcible sexual penetration (§ 289, subd. (a)(1)(A); count 7), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 8). The information also alleged that the sex offenses were committed against more than one victim (§ 667.61, subds. (b) & (e)).

At the close of evidence, defendant brought a motion for acquittal (§ 1118.1), which the trial court granted as to count 7, forcible sexual penetration of D.

On February 25, 2020, the jury found defendant guilty on counts 1 through 5, the offenses committed against his wife S. and daughter K. The jury also found true the allegation that defendant was guilty of two or more sex offenses against more than one victim. Regarding the remaining counts committed against his older daughter D., the jury found defendant guilty of simple assault (§ 240), a lesser offense of assault by means of force likely to produce great bodily injury, which was charged in count 8. The jury found defendant not guilty on count 6.

On December 3, 2020, the trial court sentenced defendant to consecutive terms of 15 years to life on each of counts 1 through 4, a concurrent term of 15 years to life on count 5, and a one-year concurrent term on count 8, for an aggregate term of 60 years to life. The court granted defendant a total of 1,257 days of custody credits, consisting of 1,093 actual days plus 164 days of conduct credit. Defendant was also ordered to pay various amounts, including a criminal justice administration fee of $129.75.

## III.  DISCUSSION

### A. *Admission of Evidence Regarding Defendant's Uncharged Sex Offenses Against His Former Wife A.*

Defendant contends that the admission of evidence of his uncharged sex offenses against his former wife A. was an abuse of discretion and violated due process. Specifically, he argues that the trial court failed to identify the factors it used to balance the probative value of the evidence against the prejudicial effect. Defendant further contends that the proffered evidence should have been excluded, because the uncharged offenses were remote in time, the court failed to consider the degree of certainty that the uncharged offenses actually occurred, defendant was never arrested or convicted for the offenses, the court should have considered the burden on defendant in defending against the allegations, and the court should have considered the availability of less prejudicial alternatives to admission of the evidence.

28

The Attorney General contends that evidence of defendant's prior uncharged offenses against his ex-wife A. were admissible under Evidence Code section 1108, were not unduly prejudicial under Evidence Code section 352, and that any error in admitting the testimony was harmless.

### 1. Background

The prosecutor filed a pretrial motion in limine to admit evidence of defendant's prior sexual assaults of three women under Evidence Code section 1108. The prosecutor contended that defendant (1) raped a woman repeatedly between approximately 1992 to 1995, (2) sexually assaulted, including raped, his ex-wife, A., repeatedly from 1995 until he went to prison in 1998 for raping another woman, and (3) was convicted in Wisconsin in 1998 for third degree sexual assault for raping a woman and sentenced to four years in prison. The prosecutor argued that the evidence was probative regarding whether defendant sexually assaulted S., who he began dating in 2000. Relevant to this appeal, the prosecutor contended that the prior sexual offenses were not inadmissible under Evidence Code section 352 because: (1) although the prior offenses occurred many years ago, it showed defendant's continuous pattern of sexually abusing young woman that he dated; (2) although defendant had not been convicted of assaulting A., she was expected to testify at trial, she would be subject to cross-examination, and defendant himself could testify and refute her claims; (3) the prior sexual assaults of the women that he dated were less inflammatory than the charges involving his sexual assault of his own daughters; and (4) any prejudice could be minimized by limiting the number of instances of Evidence Code section 1108 evidence, limiting the amount of time spent questioning A., and giving appropriate jury instructions.

Defendant filed a motion in limine to exclude the evidence pursuant to Evidence Code section 352 and his state and federal constitutional rights to due process and equal protection. Relevant to this appeal, although he "concede[d] that the allegations made by [A. were] somewhat similar to the current allegations of alleged victim [S.]," he argued

that the prior alleged offenses were too remote in time. Defendant also contended that the probative value was outweighed by the likelihood that A's testimony would create a "mini trial" resulting in an undue consumption of time, was highly prejudicial, and would confuse the issues which would confuse the jury. To the extent the evidence was admitted, defendant requested that the trial court limit the evidence to minimize the risk of prejudice and the undue consumption of time, such as by admitting only some of the prior sex offenses and excluding inflammatory details.

At the hearing at the motion, the prosecutor reiterated that the evidence of prior sexual assaults under Evidence Code section 1108 should be admitted over an Evidence Code section 352 objection. Defendant contended the evidence should be excluded based on the "prejudicial risk of not only inflaming the jury but also of confusing the issues . . . as well as the reliability of this evidence." Regarding the evidence concerning A., defendant argued that A. became pregnant with his child when she was 16 years old, which was the age of consent in Michigan. This would "confuse the jury" and "inflame them." Defendant also contended that A. provided only general statements about being hit in the face and that she was not able to "give specific times or more facts than those generalities." Finally, defendant contended that the argument that the prior sexual assaults were similar because they were " 'consensual to physical to nonconsensual' sexual relationship[s]" made "it almost too broad and too easy to say that all of these sexual assaults fall under the same umbrella to show propensity of generic sexual assaults" and that there was "a danger to prejudice [defendant] in a way that he will be unable to cure."

The trial court ruled that the sexual assaults of all three women were admissible, but limited the scope or form of the evidence. First, the court stated that "under [Evidence Code section] 352 grounds," it was going to limit the witnesses who could testify regarding the sexual assault of the first woman. Regarding defendant's sexual assault of the second woman A., the court ruled that that she would be allowed to testify

30

as she was "the direct victim and has personal knowledge and even though, as [defense counsel] indicated, it involved a wide range of conduct, as long as it's physical and/or sexual in nature, specifically if she was hit in the face or was otherwise sexually assaulted, she will be allowed to testify as to those incidents." Lastly, after stating that it had "endeavored to weigh the [Evidence Code section] 352 factors that [it was] obligated to do," the court indicated the abstract of judgment relating to defendant's conviction for sexually assaulting the third woman would be admitted, but that "there will not be any recited facts or information concerning the specifics of the conduct involved. That would be inflammatory; that would be prejudicial." The court proceeded to confirm with defense counsel that the court, "in addressing the People's [Evidence Code section] 1108 motion, that would also encompass the defense's motion in limine on the same subject matter."

### 2. Law

Generally, "propensity evidence is not admissible to prove a defendant's conduct on a specific occasion. [Citations.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 299-300; see Evid. Code, § 1101, subd. (a).) "Evidence Code section 1108 provides an exception to the general rule and permits evidence that a defendant accused of a sexual offense has committed another sexual offense, potentially showing a propensity to do so. [Citation.]" (*People v. Baker* (2021) 10 Cal.5th 1044, 1089.) " 'In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101.' [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 63 (*Loy*).) Further, " ' "[t]he Legislature has determined the need for this evidence is 'critical' given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial. . . ." [Citations.] . . . "With the enactment of [Evidence Code] section 1108, the Legislature 'declared that the willingness to commit a sexual offense is not common to most individuals . . . .' " ' [Citation.]" (*People v.*

31

*Nguyen* (2010) 184 Cal.App.4th 1096, 1115, fn. 13.) Evidence Code "[s]ection 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes. [Citation.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.)

"In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense" is subject to exclusion under Evidence Code section 352. (Evid. Code, § 1108, subd. (a).) "Evidence Code section 352, in turn, provides that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' 'In short, if evidence satisfies [Evidence Code] section 1108, and is not excluded under [Evidence Code] section 352, admission of that evidence to prove propensity is permitted.' [Citations.]" (*People v. Dworak* (2021) 11 Cal.5th 881, 899 (*Dworak*).)

" 'By reason of [Evidence Code] section 1108, trial courts may no longer deem "propensity" evidence unduly prejudicial per se,' but trial courts 'must engage in a careful weighing process under [Evidence Code] section 352.' [Citation.] . . . [T]he trial court's determination should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' [Citation.]" (*Dworak*, *supra*, 11 Cal.5th at p. 900.)

We review a trial court's rulings under Evidence Code sections 1108 and 352 for abuse of discretion. (*Dworak*, *supra*, 11 Cal.5th at pp. 899-900.) " 'To establish an

abuse of discretion, defendant[] must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason." [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' [Citation.]" (*People v. Miracle* (2018) 6 Cal.5th 318, 346-347 (*Miracle*).)

### 3. Analysis

We determine that the trial court did not abuse its discretion in finding that defendant's uncharged conduct against A. was admissible under Evidence Code sections 1108 and 352. Defendant's conduct against A. was highly probative, as it involved his sexual assault, including rape, of a young partner, similar to the charged conduct against his former wife S.

On appeal, defendant contends that "the trial court did not identify the factors it used to balance the prejudicial effect against the probative value of the evidence to be presented through [A.]" Although defendant acknowledges that a court is "presumed to have known the law and correctly applied it," he contends the presumption was rebutted in this case because it was only later during an Evidence Code section 402 hearing held on a different day that the court specifically referred to Evidence Code section 352.

We are not persuaded by defendant's contention. The California Supreme Court has stated that "a court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169 (*Taylor*).) In this case, the parties' pretrial written motions both addressed whether evidence of defendant's prior sex offenses should be excluded under Evidence Code section 352. At the hearing on the competing motions, the parties again addressed whether the evidence should be excluded under Evidence Code section 352. The trial court in ruling on the motions expressly cited

33

Evidence Code section 352 when explaining why it was limiting the witnesses or the scope of evidence as to defendant's sex offenses committed against his first and third female victims. Further, after making its ruling, the court confirmed with defense counsel that its ruling "also encompass[ed] the defense's motion in limine on the same subject matter," which as we have just explained, was a defense motion seeking exclusion of the evidence under Evidence Code section 352. Although the court did not expressly cite Evidence Code section 352 when ruling on the admissibility of defendant's sex offenses against the second female victim A., we determine that "the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*Taylor*, *supra*, at p. 1169.)

Second, defendant argues that the sex offenses involving A., which occurred in the mid to late 1990's, were "extremely remote in time," which decreased the probative value of the evidence.

We find defendant's argument unpersuasive. "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible. [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 284; see *People v. Cordova* (2015) 62 Cal.4th 104, 133 [time gap of 13 and 18 years "does not compel exclusion of the evidence"; "[n]either Evidence Code [§] 352 nor Evidence Code [§] 1108 contains rigid requirements"].) Further, the " ' "staleness" of an offense is generally relevant if and only if the defendant has led a blameless life in the interim.' [Citation.]" (*Dworak*, *supra*, 11 Cal.5th at p. 901.) In this case, defendant committed the uncharged sex offenses against A. in the years leading up to his incarceration for the sexual assault of another woman. Upon his release from prison, he began a relationship with S, the victim in the instant case, and committed sexual assaults against her throughout that relationship. As the prosecutor observed in the pretrial motion to admit the evidence, "the only thing that seems to stop [d]efendant from sexually assaulting women is going to prison." On this record, the trial court did not err in determining that

the sexual offenses committed against A. were not too remote in time. (See *ibid.* [prior sexual offense was not too remote where the defendant "was incarcerated or on parole . . . for the bulk of the time between the two incidents"]; *Loy*, *supra*, 52 Cal.4th at p. 62 [timing of prior offenses committed 15 and 21 years before the charged offense "provided no reason to exclude them" where the defendant was in prison "for much of the time" between the offenses].)

Third, defendant argues that the "degree of certainty of the commission of these offenses" against A. and the burden on him to defend against the allegations warranted exclusion of the evidence.

Defendant fails to demonstrate that the trial court erred by not excluding the evidence on this ground. At the time of the trial court's ruling, it was anticipated that A. would testify. She did in fact testify at trial, and she was subject to cross-examination. The evidence of defendant's sexual offenses against A. was limited to testimony by her, and the prosecutor's direct examination of A. was relatively brief, spanning less than 11 pages of the reporter's transcript. Defendant testified at trial and denied being violent with A. or repeatedly sexually assaulting her. "It is well settled . . . that the reliability of a witness's testimony is a matter for the jury to decide and therefore concerns the weight of the evidence, and not its admissibility. [Citation]" (*People v. Merriman* (2014) 60 Cal.4th 1, 57 (*Merriman*) [rejecting the defendant's argument that prior sexual offense evidence should have been excluded because the victim's recollection of the events was "vague, disjointed, and inherently unreliable"].)

Fourth, defendant contends that the prejudicial impact of the evidence was increased by the fact that he was never arrested or convicted for the sexual offenses against A. He argues that the jury might have been tempted to convict him of the charged offenses regardless of his guilt in order to punish him for the uncharged offenses. He further contends that the jury's attention might have been "diverted" to a determination of whether he committed the offenses against A.

35

Defendant fails to persuade us that the trial court erred in admitting the evidence. "That defendant had not been charged and convicted of any sexual crimes in connection with . . . [A.] arguably increased the potential for undue prejudice because of the risk that the jury might want to convict defendant of the charged offenses because he had escaped punishment for his crimes against [A.]. We observe furthermore that because there was no prior conviction, defendant's commission of the offenses against [A.] was less certain and he bore some additional burden defending against that evidence. [Citation.] None of these factors is dispositive, however." (*Merriman*, *supra*, 60 Cal.4th at p. 59.) As we have indicated, the evidence of sex offenses against A. demonstrated defendant's continuous pattern of sexually assaulting young female partners. "Given the strong probative value of the evidence in question, the potential for prejudice did not overcome Evidence Code section 1108's presumption in favor of admissibility of the sexual offense evidence to show defendant's propensity to commit the charged sexual offense[]" against his wife S. (*Ibid.*)

Fifth, defendant contends that the trial court should have considered the availability of less prejudicial alternatives to admission of the allegations. He argues that A. "testified in somewhat graphic detail that [defendant] had beaten her, forced her to have sex with him, forced her to perform oral sex on him, and penetrated her with a flashlight." Defendant observes that A. also testified about being hit with coat hangers. He contends that "[t]he details of these incidents - particularly the mention of coat hangers and flashlights - were sure to evoke an emotional response in the jurors. They easily could have been, and certainly should have been, excluded."

Defendant fails to demonstrate error. Although he made a general request below in his written pretrial motion in limine to "sanitize the priors if admitted" (bold omitted), defendant does not provide a record citation showing that he specifically requested that the trial court limit the evidence in the manner he now suggests. Indeed, at the time the trial court made its pretrial rulings on the parties' motions in limine, it does not appear

36

that the trial court was informed by either party that A. would be testifying about, for example, coat hangers or a flashlight. To the extent A. raised one or more of these issues when she subsequently testified outside the presence of the jury at an Evidence Code section 402 hearing, defendant did not seek a ruling from the court to limit the scope of her trial testimony as he now urges on appeal. On this record, where defendant failed to request below that A.'s testimony be limited in the manner he now urges on appeal, defendant cannot show error in the trial court's admission of the evidence. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 159 [notwithstanding an in limine motion to exclude evidence, a defendant must "renew [the] objection at trial, when the trial court would have the opportunity to evaluate [the] objections in light of the actual evidence presented"].)

In sum, we cannot say that the trial court's determination—that the probative value of the uncharged sex offenses involving A. outweighed its prejudicial effect in establishing defendant's propensity to commit the charged sexual offense involving S.— fell outside the bounds of reason. Accordingly, we determine that the court did not abuse its discretion in admitting the evidence of the uncharged sex offenses involving A. under Evidence Code sections 1108 and 352. (*Dworak*, *supra*, 11 Cal.5th at pp. 899-900.)

Defendant further contends that the admission of the evidence regarding A. violated his federal constitutional rights to due process and a fair trial. As defendant acknowledges, the California Supreme Court has "rejected the argument . . . that admission of prior crimes under Evidence Code section 1108 violates the constitutional right to due process and a fair trial." (*Dworak*, *supra*, 11 Cal.5th at p. 900.) Defendant nevertheless contends that "the admission of irrelevant and prejudicial evidence may become so 'fundamentally unfair' as to offend the United States Constitution's guarantee of due process." As we have explained, however, defendant fails to establish that the trial court did not properly engage in the required weighing process under Evidence Code section 352, the evidence of sex offenses committed against A. was probative of

37

defendant's propensity to commit sex crimes, and defendant fails to establish that admission of the evidence was unduly prejudicial under Evidence Code section 352. "The admission of the evidence thus did not violate defendant's constitutional rights." (*People v. Rhoades* (2019) 8 Cal.5th 393, 415.)

**B.** *Exclusion of Photograph of Daughter K. and Wife S.*

Defendant contends that the trial court abused its discretion by excluding a photograph of his daughter K. and wife S. In the photograph, K. is apparently standing behind S., who is topless, with K.'s arms reaching around to cover S.'s breasts. Defendant argues that the photograph was relevant "to show that [K.'s] source of sexual knowledge could have been from her mother considering the extremely close and intimate relationship between them." He also argues that the photograph was relevant to S.'s credibility, because although S. told the police that defendant forced them to pose for the picture, S. purportedly " 'backtrack[ed]' " on that explanation after it was pointed out the photograph was a " 'selfie.' " The Attorney General contends that the court did not abuse its discretion in excluding the photograph.

### 1. Background

The prosecutor filed a pretrial motion in limine to exclude the mother-daughter photograph. The prosecutor contended the photograph was irrelevant to the issues in the case, and there was "a huge risk of unfair prejudice" as jurors would speculate and leap to "unwarranted conclusions" about S. molesting or abusing K. The prosecutor also argued that the "effect of admitting this photograph would be to smear these victims and portray them as indecent, shameless, or obscene."

At the hearing on the motion, the parties indicated that K. was a "young teenager" between 11 and 13 years old in the photograph and that she appeared to be fully clothed. The photograph was a "thumbnail [picture] found on one of [S.'s] phones." The prosecutor contended that "whatever probative value" existed regarding the photograph was "substantially outweighed by the risk of undue prejudice." The prosecutor argued

38

that the "nude" photograph would be perceived as indecent and only served to "smear" and make K. and S. "look bad."

Defense counsel contended that the photograph was relevant for two reasons. First, counsel argued that K. had alleged she was molested, but the defense believed "there could be an alternate source of her . . . sexual knowledge. Not because of her experiences with it, but because of the comfort level she has with her mother and . . . with the comfort level that they've shared, the communication they've shared, and the intimacy they've shared, their nonsexual intimacy." Defense counsel clarified that he was "not making any inference that [S.] is harming [K.] in any way," only that the pair were "as close as mother and daughter can be, not sexually." Second, defense counsel contended that S.'s initial reaction when asked by the police about the photograph was to "blame" defendant and say that "[he] took that picture." However, after the police indicated that it was a "selfie," in which S. was holding the phone in her hand and taking the picture, "she had to backtrack that story." Counsel argued that the photograph thus showed S.'s bias towards defendant.

The trial court ruled that the photograph would be excluded. The court stated, "[I]t may be probative – minorly probative on bias, but I just don't really see that that needs to come in to make that point." The court stated that defense counsel could examine S. at trial and presumably she would not deny the existence of the photograph. However, if defense counsel was trying to establish bias, there were "other avenues for doing that," and this photograph was "too distractive and time-consuming."

Defense counsel sought clarification about questioning S. at trial about the picture. The trial court replied that "if this is the sole piece of bias," then counsel was entitled to question S. about it. However, if the photograph was "only one little piece of . . . the bias puzzle," and counsel had "other instances of exchanges, communications, circumstances that are going to make that point," then the photograph was "really just cumulative on the point of bias, and it doesn't really need to come in." The court stated that if this

particular photograph was "the only way" counsel could make the point, then the court would "revisit that, looking at the photo. But for the time being, that whole subject matter should not necessarily be brought up or come in."

Defense counsel then asked whether the limitation on evidence also included "asking [K.] about her source of knowledge of sex and sexual activities." The trial court responded affirmatively and explained, "I think for the same reason. Even more so, . . . I think that's just getting far outside the aura of the sphere of relevancy and probativeness." The court ruled that "that whole subject is to be steered away from."

### 2. Law

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," including the credibility of a witness. (*Id.*, § 210.) A trial court has discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*, § 352.)

As we stated above, we review a trial court's rulings under Evidence Code section 352 for abuse of discretion. (*Dworak*, *supra*, 11 Cal.5th at pp. 899-900.) " 'To establish an abuse of discretion, defendant[] must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason." [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' [Citation.]" (*Miracle*, *supra*, 6 Cal.5th at pp. 346-347.)

### 3. Analysis

We find no abuse of discretion in the trial court's exclusion of the photograph. First, the photograph, as described in the record with K. holding her mother's bare

breasts, would not have "any tendency in reason to prove or disprove" K.'s knowledge of sex, or her report as a teenager of defendant sexually abusing her when she was younger. (Evid. Code, § 210.)  K. testified, among other things, that defendant made her hold his penis and put her mouth on his penis, put his mouth on her vagina, and put his penis in her vagina which she found to be physically painful when it occurred.  The photograph "would simply have invited to the jury to speculate" (*People v. Curl* (2009) 46 Cal.4th 339, 360 (*Curl*)) that K.'s physical descriptions of these sex acts by defendant somehow came from "nonsexual intimacy" with her mother as argued by defendant's trial counsel, and that K. used this purported knowledge to fabricate a report of sexual abuse by defendant.  As these are " 'speculative inferences,' " the photograph was not relevant and the court did not err in excluding it.  (*Ibid.*; see *People v. Nieves* (2021) 11 Cal.5th 404, 445 (*Nieves*) [no abuse of discretion by "excluding evidence that produces only speculative inferences"].)

The trial court likewise did not err in excluding the photograph as being "too distractive and time-consuming" notwithstanding its finding that the photograph was "minorly probative on bias."  We understand the trial court's ruling in this context to mean that the photograph's minimal probative value was substantially outweighed by: (1) the risk of undue prejudice from a seemingly provocative mother-daughter photograph, and (2) the likelihood that the photograph would create the need for additional evidence about the circumstances of the photograph and evidence from the prosecutor to rebut any speculation or "unwarranted conclusions" that K. and S. had posed for an "indecent, shameless, or obscene" photograph.  The court explained that it would "revisit" its ruling excluding the photograph if the photograph was "the sole piece of bias" that defense counsel had.  On appeal, defendant does not dispute that he had other evidence to establish S.'s bias against him.  Given the nature of the photograph itself and the existence of other evidence to establish S.'s bias against defendant, we find no abuse of discretion in the court's determination that the risk of undue prejudice and

41

undue consumption of time substantially outweighed the minimal probative value of a provocative mother-daughter photograph.

For the first time in his reply brief on appeal, defendant argues that the photograph "demonstrates . . . that [S.], motivated by jealousy, may have coached [K.] about sexual activity in order to prepare her for making false yet convincing accusations against [defendant]. The photograph would have made the defense argument much more plausible even though the actual image did not explain how she knew about certain specifics." Defendant fails to provide a record citation showing that he made this argument below in opposition to the prosecutor's motion in limine to exclude the photograph. On the merits, defendant's argument amounts to speculative inferences that he seeks to have the jury draw from the photograph and as such, the court did not err in excluding the photograph. (*Curl*, *supra*, 46 Cal.4th at p. 360; *Nieves*, *supra*, 11 Cal.5th at p. 445.)

## C. *Admission of CSAAS Expert Testimony*

Defendant filed a pretrial motion in limine seeking to exclude or limit CSAAS evidence. After hearing argument from the parties, the trial court ruled that CSAAS evidence would be admitted, except regarding the issue of retraction as the parties had agreed there was no evidence the victim had retracted her report of abuse. At trial, the jury was instructed pursuant to CALJIC No. 10.64 that CSAAS evidence "must not be considered . . . as proof that the alleged victim's molestation claim is true"; that CSAAS "seeks to describe and explain common reactions of children to that experience"; that the jury was to "presume the defendant innocent"; that the "People have the burden of proving guilt beyond a reasonable doubt"; and that CSAAS evidence should be considered "only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

On appeal, defendant does not challenge the specifics of the trial court's ruling under the particular facts of this case. Instead, he contends that "CSAAS evidence should be inadmissible for all purposes because it is unreliable in that, by its very nature, it will always support the conclusion that the abuse actually occurred." The Attorney General contends that the trial court did not abuse its discretion in admitting the evidence.

Expert opinion testimony is admissible when the opinion is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Relevant here, expert opinion testimony is permitted "to explain to lay jurors conduct that may appear counterintuitive in the absence of such insight. [Citations.]" (*People v. Ward* (2005) 36 Cal.4th 186, 211.) Indeed, " '[t]he jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission . . . . It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [or women] of ordinary education could reach a conclusion as intelligently as the witness." ' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 (*McAlpin*).)

CSAAS evidence has long "been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. [Citations.]" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 (*Patino*); see also *McAlpin*, *supra*, 53 Cal.3d at pp.1300-1301; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); *People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*); *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394.) Such expert testimony is admissible "if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation. [Citations.]" (*Patino*, *supra*, at pp. 1744-1745.)

The California Supreme Court has explained in the analogous context of the rape trauma syndrome that expert testimony "may play a particularly useful role by disabusing

43

the jury of some widely held misconceptions about [abuse] and [abuse] victims, so that it may evaluate the evidence free of the constraints of popular myths. [Citations.]" (*People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248, fn. omitted.) The California Supreme Court has also referenced "the close analogy between use of expert testimony to explain the behavior of domestic violence victims, and expert testimony concerning victims of rape or child abuse," and has held that expert testimony regarding commonly observed behaviors of domestic violence victims, such as the tendency to recant, is admissible. (*People v. Brown* (2004) 33 Cal.4th 892, 905; see *id.* at pp. 895-896, 906-907.) Further, in the analogous context of a parent of an abused child, the California Supreme Court has observed that "[m]ost jurors, fortunately, have been spared the experience of being the parent of a sexually molested child. Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial." (*McAlpin*, *supra*, 53 Cal.3d at p. 1302.)

Given that the expert testimony in this case sought to explain behaviors by a child sexual abuse victim that may appear counterintuitive, such as those behaviors exhibited by K., and given that the California Supreme Court has observed that most jurors lack personal experience with child molestation victims, we believe the trial court could have properly determined that expert opinion regarding CSAAS "[r]elated to a subject that is sufficiently beyond common experience" and "would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

Relying on several out-of-state cases, we understand defendant to contend that the California cases should be reexamined. We decline to do so. To the extent our Supreme Court has recognized that such evidence may be relevant, useful, and admissible in the analogous contexts of rape or domestic violence of adult victims, as an intermediate appellate court we are required to follow that precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

44

We are also not persuaded by defendant's contention that CSAAS evidence should be excluded as unreliable. Under the *Kelly* rule,[3] "evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test." (*Bolden*, *supra*, 29 Cal.4th at p. 544.) In contrast to evidence that is based on a new scientific technique or procedure, expert *opinion* testimony is generally not subject to *Kelly*. The California Supreme has explained that "in most cases no similar caution is required before a jury considers expert *opinion* testimony. Unlike results 'produced by a machine,' to which jurors may 'ascribe an inordinately high degree of certainty,' jurors presented with the personal opinion of a witness, even an expert witness, 'may temper their acceptance of his [or her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible.' [Citations.] For this reason, ' " '[a]bsent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly*[]." ' [Citations.]" (*People v. Peterson* (2020) 10 Cal.5th 409, 458.) California courts have thus held that expert opinion testimony about CSAAS is not subject to the *Kelly* rule. (See, e.g., *Lapenias*, *supra*, 67 Cal.App.5th at p. 173; *Munch*, *supra*, 52 Cal.App.5th at pp. 472-473; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449.)

Accordingly, we conclude that the trial court did not err in admitting expert testimony about CSAAS.

---

[3] As explained by the California Supreme Court, "[u]ntil 1993, this rule was generally known in this state as the *Kelly-Frye* rule because this court in [*People v.*] *Kelly* [17 Cal.3d 24] had relied on the reasoning of a federal appellate court decision, *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*). In 1993, the United States Supreme Court held that the Federal Rules of Evidence had superseded *Frye* [citation], and our state law rule is now referred to simply as the *Kelly* test or rule. [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 545 (*Bolden*); accord, *Nieves*, *supra*, 11 Cal.5th at p. 442, fn. 8.)

**D.** *Prosecutor's Recitation of Facts Underlying Defendant's 1998 Conviction on Cross-Examination of Defense Character Witnesses*

Defendant contends that the prosecutor committed misconduct in cross-examination of defense character witnesses by reciting the facts of defendant's 1998 Wisconsin conviction for third degree sexual assault, after the court previously ruled during pretrial motions in limine that the underlying facts would be excluded. He also argues that the court erred by changing its ruling during trial to allow the prosecutor to recite the facts on cross-examination and that his federal constitutional rights to due process and a fair trial were violated. To the extent his claims are forfeited, defendant contends that his trial counsel rendered ineffective assistance of counsel.

The Attorney General contends that the trial court properly allowed the prosecutor to cross-examine defendant's character witnesses about the prior conviction, that any error in allowing the cross-examination was harmless, and that defendant has not shown ineffective assistance of counsel.

### 1. Background

As we set forth above, the prosecutor filed a pretrial motion in limine to admit evidence of defendant's prior sexual assaults of three women under Evidence Code section 1108. Relevant here, the prosecutor stated that defendant was convicted of third degree sexual assault in Wisconsin in 1998, for raping a woman, K.A. The prosecutor reported that the complaint included the following allegations: In December 1997, K.A. reported that defendant, who was her boyfriend, told her after they had started to have intercourse that he wanted to whip her for 10 minutes. She said, " 'No.' " While she was in a kneeling position, defendant held her head down and told her to enjoy it. He repeatedly hit her with a belt. She cried and told him " 'over and over again' " to stop. He kept moving her hands out of the way. After having sexual intercourse, defendant looked at her back, told her to keep it covered, and told her not to show anyone. The prosecutor argued that the conviction was admissible under Evidence Code section 1108

46

regarding defendant's propensity to commit sex offenses and was not inadmissible under Evidence Code section 352. The prosecutor filed a separate motion in limine to admit certified records of defendant's 1998 conviction, specifically the complaint, information, and minute orders reflecting his plea and sentence.

Defendant filed a motion in limine to exclude the evidence pursuant to Evidence Code section 352 and his state and federal constitutional rights to due process and equal protection. To the extent the evidence was admitted under Evidence Code section 1108, defendant requested generally that the evidence be "sanitize[d]." (Bold omitted.) Further, to the extent his prior sexual offense against K.A. was admitted, defendant argued that the prosecutor should be required to produce a live witness to establish his commission of the sexual offense, not simply rely on a court record.

At the hearing on the motion, the prosecutor indicated that K.A. was unwilling to testify at trial and that the 1998 conviction would be established through certified court records from Wisconsin. Defense counsel indicated that to the extent the conviction was admitted into evidence, the parties agreed that only the record of conviction, specifically the abstract of judgment, would be admitted, "not any of the probable cause statements included in the [c]omplaint."

The trial court ruled that defendant's conviction involving K.A. would be admitted. The court stated, however, that the evidence would be limited to the abstract of judgment, and there would "not be any recited facts or information concerning the specifics of the conduct involved. That would be inflammatory; that would be prejudicial . . . ."

Later in the hearing on the parties' other motions in limine, the trial court addressed the prosecutor's motion to limit character testimony regarding defendant to reputation and opinion only and to preclude him from introducing specific instances of his good conduct. Defendant's trial counsel indicated that the defense evidence would be limited to reputation and opinion. The court stated: "And that being the case, I just

want to make sure that we anticipate or at least we are in agreement as to any . . . questioning . . . from the part of the People on cross, because my experience has been normally when you get into opinion and reputation, inevitably the character witnesses learn something about the person of whom they're speaking. And, you know, they may or may not be aware that he's been convicted. And, frankly, I know that typically it's . . . a line of questioning[,] 'Well, did you know that he was convicted of sexual assault?' And just so we know that that's on the table. That's not being excluded. And I don't want any surprises when that's -- or I don't want any battles when that's brought up because it's fair game. [¶] I think when you put somebody's reputation and character at issue and if the witnesses are testifying to it -- and it may well be that they just recently learned it, but that's also a fair line of questioning. [¶] I only mention it because we need to anticipate that and make sure that it doesn't create any evidentiary issues or delays about whether or not that's proper subject of cross-examination. [¶] So, to sum it up, the Court will grant that motion in limine and limit character evidence to reputation and opinion. And any testimony presented, the witnesses can be questioned about their knowledge or awareness of any prior convictions for the sexual assault conviction that we've been discussing."

During the cross-examination of two defense character witnesses at trial, the prosecutor referred to the facts underlying defendant's 1998 Wisconsin conviction in the following contexts.

### a. *Examination of next door neighbor Empleo and objection by defense counsel*

Empleo, the next door neighbor at the RV park, testified on direct examination that defendant was a "very quiet, peaceful man" and that he was never "sexually inappropriate." On cross-examination by the prosecutor, the neighbor confirmed that defendant was peaceful, nice, and not violent. When asked whether she knew that in 1997 defendant had raped a woman, the neighbor responded that she had "heard of that."

48

Defense counsel then objected, stating, "We dealt with this conviction in in limines." The trial court initially sustained the objection and proceeded to have a sidebar with counsel. After the unreported discussion, the court went back on the record and stated, "So the Court will overrule the objection and allow counsel to pursue the line of questioning. And we've at sidebar discussed at length the parameters of the previous in limine motion and ruling."

The prosecutor then proceeded to ask the neighbor on cross-examination, "So . . . you had described the defendant as a nonviolent, peaceful, nice person. So what I want to ask you is did you know that in 1997 he had nonconsensual, forcible sex with a woman? He told her he wanted to whip her for ten minutes. She said no. He held her head down and said to enjoy it. He continued to strike her. She asked to stop and tried to protect herself. He continued. She cried and asked him to please stop. He continued and had sex with her nonetheless. And then he told her, after he looked at her back, told her to keep it covered and not to show anyone. Were you aware of that?" The neighbor responded, "No, not really," and indicated that it did not change her opinion about defendant. She explained that it was "the past," and "[a]s long as it doesn't affect [her]" she was "okay" with it. When asked whether the prosecutor's description was "pretty sexually inappropriate," the neighbor responded, "If it was to me, yes. If it was to somebody else, that's them."

On redirect examination, the neighbor indicated that she had no "way of knowing" whether the prosecutor's description was "true or false."

On recross-examination, the neighbor admitted that she knew defendant was convicted of sexual assault in 1998.

### b. *Examination of defendant's friend Turner*

Defendant's friend and jujitsu training partner, Turner, testified on direct examination that defendant was not a violent person with respect to S. and K. and that defendant was not someone who was capable of sexual assault. The friend was not

aware that defendant had been imprisoned years ago for sexual assault. "If evidence was supplied" that defendant used physical force to have sex with someone who did not consent, the friend testified that it would change his opinion about defendant.

On cross-examination, the friend confirmed that in his opinion, defendant was a nonviolent person outside the realm of sporting events and jujitsu and that defendant was not capable of sexual assault. The prosecutor then asked the friend whether he knew that: "In 1997 in Wisconsin [defendant] had sex with a woman against her will. He struck her. He said he wanted to whip her for ten minutes. She said no. He held her head down and said to enjoy it. He continued to strike her with a belt. Again she asked him to stop and tried to put her hands over her back, but he kept moving them. She cried and asked him to please stop, but he persisted. And after the sexual assault, he checked her back and told her to keep it covered and not to show anyone." The friend responded that he was not aware of it. He agreed that it was "violent" if "that account [was] accurate." The friend also did not know that in 1998, defendant was convicted of sexual assault in Wisconsin. The friend was further asked whether he knew that defendant had beat and sexually assaulted his first wife, L., in Wisconsin, and that he had beat, raped, and sexually assaulted his second wife, A. The friend indicated that he did not know, but he agreed that "those things [were] violent." The friend indicated that the information revealed by the prosecutor would change the friend's opinion about whether defendant was capable of sexual assault.

On redirect examination, the friend stated that he did not know whether any of "the horrible things that the [prosecutor] just read" were true.

### c. *Further discussion by the court and parties about character evidence and cross-examination of C.*

Later in the trial, C., with whom defendant had an affair while he was still married to S., testified that defendant was sweet, thoughtful, gentle, nonviolent, and appropriate around her children. The prosecutor in cross-examination asked her about defendant's

conversations with his brother in which defendant made, for example, sexual comments about C.'s daughter. In response to objections by defense counsel, the trial court and counsel held a discussion outside the presence of the jury. The court explained that the prosecutor had indicated that he intended to ask C. about additional bad conduct by defendant and its effect on C.'s opinion of defendant's character traits. The court indicated that defense counsel had objected based on Evidence Code section 352. The court explained that it had asked the prosecutor how many more incidents he intended to raise with C. because at some point it might become cumulative. After further discussion between the court and the prosecutor, the prosecutor stated that the defense had "got[ten] into character traits like honesty, how good of a person [defendant] is, how gentle he is, [and] how nonviolent he is . . . . [¶] And the Court warned of the risks of this. And I know that we're all aware of the risks of opening the door with character evidence. [¶] So when you spend 20 minutes with the witness, not to mention all the other witnesses we've heard from today, painting a picture of the defendant as all these great things when it turns out he's anything but – in fact, he is the opposite of these things -- to let a jury sit here and listen to this over and over, you -- we get a chance to show that that's just not true. [¶] And all I'm trying to do is question these witnesses about whether they really know the defendant. And I'm trying to frame the questions in that fashion. [¶] . . . [¶] As the Court knows, once a witness describes a character trait and presents character evidence, the prosecution does get to cross-examine and ask 'did you know' or 'had you heard things.' And, as you can see, a lot of these witnesses are changing their opinion because there's a good reason to change their opinion. [¶] This has all been discovered to the defense, and it was voluminous."

Defense counsel stated the following in response, "As far as the witnesses today, I concede that [defendant's friend Turner] and [the next door neighbor Empleo] were asked about the opinion and reputation that they had of [defendant]. I was very careful with the other witness -- and the People were able to ask about specific incidents of

51

misconduct to ask them if it changed their opinion. They spoke of prior sexual assaults. They spoke of many allegations with both of those witnesses. [¶] The other witnesses – [defendant's friend Schilbe] and [the officer manager and the property manager for the RV park] -- I asked them specifically about watching interactions between [defendant] and his wife, [defendant] and his daughter -- the two victims in this case. I stayed away from opinion/reputation evidence. I didn't ask them what his nature was as to violence, as to sexual inappropriateness with those witnesses." Defense counsel proceeded to discuss his examination of C., and the court issued its ruling regarding the scope of additional incidents that the prosecutor could use in cross-examining C.

After the close of evidence, the jury was instructed pursuant to CALCRIM No. 350 regarding character testimony as follows: "You have heard character testimony that the defendant is a polite, non-violent, sexually appropriate, nice person. [¶] Evidence of the defendant's character for those traits can by itself create a reasonable doubt whether the defendant committed any or all of the crimes charged. However, evidence of the defendant's good character may be countered by evidence of his bad character for the same trait. You must decide the meaning and importance of the character evidence. [¶] You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

The jury was also instructed pursuant to CALCRIM No. 351 regarding the cross-examination of character witnesses as follows: "The attorney for the People was allowed to ask defendant's character witnesses if they had heard or knew that the defendant had engaged in certain conduct. These 'have you heard' or 'did you know' questions and their answers are not evidence that the defendant engaged in any such conduct. You may consider these questions and answers only to evaluate the meaning and importance of the character witness's testimony."

52

The jury was further instructed pursuant to CALCRIM No. 222 that "[n]othing that the attorneys say is evidence," that "[t]heir questions are not evidence," and that the jury should "not assume that something is true just because one of the attorneys asked a question that suggested it was true."

## 2. Law

"In a criminal action, the defendant may introduce evidence of his or her own good character. [Citation.] Such evidence may be in the form of a witness's own opinion, based on the witness's perceptions, or in the form of the defendant's reputation, based on what the witness has heard from others. [Citations.]" (*People v. Hawara* (2021) 61 Cal.App.5th 704, 712-713 (*Hawara*).)

"Once a witness testifies, on direct examination, to the defendant's good character, it is a common and accepted method of cross-examination to ask whether the witness is aware of instances of the defendant's bad character. A variant of this is to ask, as here, whether the witness's opinion would change if the witness became aware of instances of the defendant's bad character." (*Hawara*, *supra*, 61 Cal.App.5th at p. 713.) The witness may be asked about events or acts that have " 'indisputably' occurred," or that " 'the cross-examiner ha[s] in his [or her] possession information that reasonably leads him [or her] to believe that the acts of conduct by defendant have in fact been committed or the reports of their commission have been generally circulated. [Citation.]' [Citations.]" (*Id.* at p. 713, fn. 8.)

Regarding the form of the question on cross-examination, it is "proper" to ask " 'if you heard' " "when the witness has testified to the defendant's reputation[] based on what the witness has heard." (*Hawara*, *supra*, 61 Cal.App.5th at p. 713, italics omitted.) Alternatively, "when the witness has testified to the witness's own opinion, based on the witness's perceptions, it is perfectly proper to ask, 'if you knew.' " (*Ibid.*, italics added.)

" 'The rationale for permitting the prosecution to cross-examine a defendant's good-character witness as to whether or not he [or she] has heard rumors or reports of

defendant's arrest or conviction of other offenses inconsistent with the character trait testified to, is that such cross-examination tests and exposes weaknesses in the witness' knowledge of the reputation. [Citations.]' " (*People v. Hempstead* (1983) 148 Cal.App.3d 949, 954 (*Hempstead*).) Likewise, "[w]hen, as here, a witness is called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity to let the jury test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has knowledge of events or acts . . . ." (*Ibid.*)

"If allowing these questions and answers would create a substantial danger of undue prejudice to the defendant, the trial judge has the discretion to preclude them under Evidence Code section 352." (*Hempstead*, *supra*, 148 Cal.App.3d at p. 954.) We review a trial court's rulings under Evidence Code section 352 for abuse of discretion. (*Dworak*, *supra*, 11 Cal.5th at pp. 899-900.)

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] . . . If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

### 3. Analysis

Defendant contends that although the trial court ruled during pretrial motions in limine that the underlying facts of his 1998 Wisconsin conviction would be excluded as inflammatory and prejudicial, the court at trial, after a defense objection and unreported sidebar conference, permitted the prosecutor to recite the facts on cross-examination of character witnesses Empleo (the next door neighbor) and Turner (defendant's friend).

54

Defendant argues that the latter ruling was erroneous because "nothing . . . had transpired during the trial [that] made these acts any less inflammatory and prejudicial than they were when the court made its in limine ruling."

We disagree with defendant's characterization of the record that "nothing . . . had transpired" during trial that could account for the trial court's change in ruling, and we further determine that defendant has not met his burden on appeal to show that the court erred in its ruling at trial. The court's pretrial ruling that the underlying facts of the conviction would be excluded as inflammatory and prejudicial under Evidence Code section 352 was made in the context of the parties' competing motions regarding whether evidence of defendant's prior sex offenses would be admitted under Evidence Code section 1108. Later, at that same pretrial hearing, the court cautioned that if defendant presented character witnesses, the prosecutor would be allowed to cross-examine the witnesses "about their knowledge or awareness of any prior convictions for the sexual assault conviction that we've been discussing." At trial, defendant offered the testimony of several character witnesses, including next door neighbor Empleo and friend Turner. The court, as it had earlier indicated, allowed the prosecutor to cross-examine both witnesses about their knowledge of defendant's prior sexual assault and resulting conviction. The underlying facts of defendant's prior sexual assault conviction were thus raised by the prosecutor in connection with the cross-examination of defendant's character witnesses, not in connection with the presentation of Evidence Code section 1108 evidence and not in violation of the court's pretrial ruling excluding under Evidence Code section 352 certain Evidence Code section 1108 evidence.

Regarding defendant's challenge to the trial court's ruling allowing the underlying facts to be presented in the cross-examination of two of his character witnesses, defendant does not provide an adequate record for us to determine whether error occurred. When defendant's trial counsel objected to the prosecutor's recitation of facts on cross-examination, the basis for counsel's objection was that "[w]e dealt with this

conviction in in limines." The court initially sustained the objection. After an unreported sidebar discussion in which "the parameters of the previous in limine motion and ruling" were "discussed at length," the court overruled the objection. Based on this limited record, it is unclear whether defendant was objecting only on the grounds that the prosecutor had violated the earlier in limine ruling which, as we have explained, only addressed an Evidence Code section 352 objection in the context of admitting evidence under Evidence Code section 1108, or whether defendant was raising a new Evidence Code section 352 objection in the specific context of the cross-examination of a character witness. Without an adequate record concerning the sidebar discussion, defendant cannot meet his burden to show that the trial court abused its discretion in allowing the prosecutor's cross-examination. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 [appellant has burden to show error and " 'all presumptions in favor of the trial court's action will be made by the appellate court' "].) We therefore turn to the question of whether defendant's trial counsel rendered ineffective assistance of counsel.

The next door neighbor Empleo testified to defendant's good character with respect to being peaceful, nonviolent, and never sexually inappropriate. On cross-examination, when asked whether she knew that defendant had raped a woman in Wisconsin in 1997, Empleo indicated that she had "heard of that" yet she apparently maintained the same opinion that defendant was peaceful, nonviolent, and never sexually inappropriate. Defendant's other character witness, his friend Turner, likewise opined that defendant was not a violent person or someone who was capable of sexual assault. On this record, the trial court could have reasonably determined that the underlying facts concerning the 1997 Wisconsin incident, including that defendant repeatedly whipped the victim over her cries to stop and that he then had sex with her, were relevant and probative for testing Empleo's and Turner's opinions that defendant was peaceful, nonviolent, and never sexually inappropriate. (See *People v. Clair* (1992) 2 Cal.4th 629, 684 [cross-examination "must be 'specific' and must 'relate directly to a particular

56

incident or character trait defendant offers in his own behalf' "].)  The questioning by the prosecutor "could reasonably have 'let the jury test the validity of the opinion or the weight to be given it' [citation]:"  the information in the prosecutor's question "[could] certainly be judged inconsistent with" peacefulness, nonviolence, and sexually appropriateness as opined by Empleo and Turner.  (*Id*. at pp. 684-685.)  Further, in view of the character traits at issue – peaceful, nonviolent, and never sexually inappropriate – the court could have reasonably determined that the prosecutor's questions on cross-examination were not substantially more prejudicial than probative.  On this record, defendant fails to establish that (1) his trial counsel was ineffective for failing to specifically object on Evidence Code section 352 grounds to the prosecutor's cross-examination of character witnesses Empleo and Turner, and (2) that there is a reasonable probability that, but for trial counsel's failure to object, the result of the proceeding would have been different.  (*Lopez*, *supra*, 42 Cal.4th at p. 966.)  Further, in view of defendant's failure to establish that the trial court erred under Evidence Code section 352 in allowing the prosecutor to cross-examine defendant's character witnesses about the facts underlying the Wisconsin conviction, defendant also fails to establish a violation of his rights to due process and a fair trial.

### E.  *Cumulative Error*

Defendant contends that the combined effect of the individual errors during trial was prejudicial.  As we have found no individual error, we reject defendant's cumulative error argument.

### F.  *Custody Credit*

Defendant contends that the abstract of judgment erroneously indicates actual custody credit of 1,093 days.  He argues that he was in county jail from December 3, 2017, through the date of sentencing on December 3, 2020, and that he is therefore entitled to actual credit of 1,097 days.  With the addition of conduct credit of 164 days, defendant contends that his total presentence custody credits should be 1,261 days.

The Attorney General contends that defendant fails to provide a record citation in his opening brief on appeal that shows the date he was initially taken into custody. In reply, defendant cites to the probation report.

The probation report reflects that defendant was arrested on December 3, 2017. The probation report indicates that he remained in custody through June 19, 2020, the date of the probation report, for 930 actual days.

The sentencing hearing took place on December 3, 2020. Defendant was in custody at that time. The trial court calculated defendant's actual time in custody as 1,083 days. However, defendant's trial counsel stated that he calculated 1,093 actual days based on "the day [defendant] was arrested to today." The prosecutor "defer[red]" to defense counsel's calculation.

Based on the day defendant was arrested, December 3, 2017, through day of sentencing, December 3, 2020, defendant is entitled to 1,097 actual days. (See *People v. Valdes* (2020) 53 Cal.App.5th 953, 955 [for a defendant who is continuously in custody, calculation of custody credit includes the day of arrest and the day of sentencing].) With conduct credit of 164 days (see § 2933.1, subds. (a) & (c); *People v. Ramos* (1996) 50 Cal.App.4th 810, 815-816), defendant's total custody credits are 1,261 days. We will order the judgment modified accordingly.

### G. *Criminal Justice Administration Fee*

At the sentencing hearing on December 3, 2020, the trial court ordered defendant to pay a criminal justice administration fee of $129.75 to the City of Morgan Hill. Although the court did not expressly state the statutory basis for the fee, the probation report recommended that the amount be imposed pursuant to former Government Code sections 29550, 29550.1, and 29550.2.

On appeal, defendant contends that the criminal justice administration fee is no longer collectible based on Government Code 6111, subdivision (a), and that any

outstanding balance must be vacated. The Attorney General agrees. We find the Attorney General's concession appropriate.

Government Code section 6111 states: "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (*Id*., subd. (a).) In other words, "by its plain terms," Government Code section 6111 "make[s] *any* unpaid portion of the identified assessments, as they existed on June 30, 2021, 'unenforceable and uncollectible' as of July 1, 2021. [Citation.]" (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626, italics added.) Further, "the statute also mandates that any portion of a judgment imposing those fees be vacated. Accordingly, based on the plain language of the statute, the unpaid balance of the . . . criminal justice administration fee[] must be vacated." (*Id*. at pp. 626-627, italics & fns. omitted.).

## IV. DISPOSITION

The judgment is modified to reflect 1,097 actual days and 164 days of conduct credit (Pen. Code, § 2933.1), for a total of 1,261 days of presentence custody credits.

The portion of the $129.75 criminal justice administration fee that remained unpaid as of July 1, 2021, is vacated. The clerk of the superior court is directed to amend the abstract of judgment to reflect the vacatur of any balance of the criminal justice administration fee that remained unpaid as of July 1, 2021.

As amended, the judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*People v. Kitzman*
**H048726**